UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
GREATER BOSTON PLUMBING                  )
CONTRACTORS ASSOCIATION,                 )
                                        )
            Plaintiff,                   )
                                        )
v.                                       )        Civil Act. No. 1:20-cv-12283
                                        )
WILLIAM ALPINE, in His Official Capacity as )
Director of the Massachusetts Department )
of Family and Medical Leave,             )
                                        )
            Defendant.                   )
_____ )

**DEFENDANT'S MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS FOR LACK OF
ARTICLE III SUBJECT-MATTER JURISDICTION**

By his attorneys,

MAURA HEALEY
ATTORNEY GENERAL

Douglas S. Martland, BBO # 662248
Julie E. Green, BBO # 645725
            *Assistant Attorneys General*
Pierce O. Cray, BBO # 104630
            *Senior Appellate Counsel*
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
617-936-2062/2085/2084
douglas.martland@mass.gov
julie.green@mass.gov
pierce.cray@mass.gov

Dated: June 29, 2022

**TABLE OF CONTENTS**

I.     RELEVANT STATUTORY AND FACTUAL BACKGROUND ....................................2

       A.     PCA and Its Multi-Employer Health Benefits Plan....................................2

       B.     The Massachusetts Paid Family and Medical Leave Act .........................2

       C.     PCA's Efforts to Have PFMLA Section 2(f) Amended ...........................3

       D.     The Impact (or Not) of Amended Section 2(f) on PCA's Contractors ...................6

       E.     PCA's Present Lawsuit and Its Preemption Claims .................................9

II.    ISSUES OF ARTICLE III SUBJECT-MATTER
       JURISDICTION ARE APPROPRIATELY RAISED
       BY A POST-ANSWER MOTION TO DISMISS
       SUPPORTED BY DECLARATIONS ................................................................9

III.   PERTINENT ARTICLE III STANDING AND
       RIPENESS STANDARDS ..............................................................................11

IV.    PCA HAS FAILED TO SHOW EITHER THAT ANY OF
       ITS CONTRACTORS HAVE ACTUALLY VIOLATED
       SECTION 2(f) OR THAT SUCH A VIOLATION IS IMMINENT,
       WHICH BOTH PRECLUDES THE "INJURY IN FACT"
       NECESSARY FOR ARTICLE III STANDING AND
       RENDERS THE ASSERTED PREEMPTION CLAIMS UNRIPE................................15

V.     PCA ADDITIONALLY LACKS STANDING BECAUSE ANY SUPPOSED
       HARM IS ENTIRELY SELF-INFLICTED, WHICH FAILS TO
       SATISFY BOTH ARTICLE III'S "INJURY IN FACT" AND
       ITS "TRACEABILITY" STANDING REQUIREMENTS...............................................18

       CONCLUSION              .....................................................................................20

The Massachusetts Paid Family and Medical Leave Act ("PFMLA"), Mass. G.L. c. 175M, was one of several major pieces of 2018 economic legislation enacted as part of a "grand bargain" supported by both business and worker advocates.  Consistent with its title, the PFMLA provides most Massachusetts workers with the right to take paid leave for several important family and medical reasons.  In the present lawsuit, the Greater Boston Plumbing Contractors Association ("PCA"), on behalf of a group of plumbing contractors, seeks to void a key part of the PFMLA:  Section 2(f), which requires employers to maintain their workers' health-insurance benefits during PFMLA leave.  Mass. G.L. c. 175M, § 2(f).  This provision ensures that a worker will not have to choose between, for example, caring for a seriously ill family member and keeping health insurance.  PCA nevertheless seeks to have Section 2(f) stricken as preempted by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-1461, and the Labor Management Relations Act ("LMRA"), 29 U.S.C. §§ 141-87.

For two reasons, this attempt to void a key portion of a state's duly enacted worker-protection law founders on the bedrock rule that federal courts can resolve only those "Cases [and] Controversies" encompassed by Article III of the Constitution.  U.S. Const. art. III, § 2.  First, PCA has yet to establish that any of its member contractors have even been affected by Section 2(f), since they participate in a plan that is already designed to provide health insurance during periods of leave or unemployment, and there is no proof that any of their employees have lost insurance because of PFMLA leave, or that such a loss is imminent.  This both renders any preemption issue unripe for Article III purposes and precludes any assertion of Article III standing.  Second, PCA specifically *asked* the State Legislature to amend Section 2(f) to provide it with state-law authority to undertake an action that it said would avoid any potential issues with ERISA and the LMRA.  But once the Legislature amended Section 2(f) in the exact manner

PCA had requested, PCA then failed to take the now-authorized action that it had said would allow it to resolve those issues, instead deciding to continue with the present litigation.  As recognized by two Circuits, this voluntary choice constitutes "self-inflicted harm" that provides a further reason why PCA lacks Article III standing.  Given the absence of either standing or ripeness, the Court should dismiss PCA's suit for lack of subject-matter jurisdiction.

## I.  RELEVANT STATUTORY AND FACTUAL BACKGROUND

### A.  PCA and Its Multi-Employer Health Benefits Plan

PCA is a trade association that "represents the interests of approximately sixty unionized plumbing contractors . . . in the Greater Boston area" and that has entered into a collective bargaining agreement on their behalf ("CBA") with the Plumbers and Gasfitters Local Union No. 12 ("Local 12").  Second Amended Complaint ("Compl.") (Dckt. # 8) p. 1, ¶ 1.  PCA and Local 12 have cooperated in the establishment of the Local 12 Health and Welfare Plan ("Plan"), a multi-employer ERISA employee welfare benefit plan that provides health insurance to the employees of PCA's member contractors ("Contractors").  *Id*. p. 2, ¶¶ 17-18.  The Plan does so by maintaining a fund that pays the premiums for the employees' health insurance and that is itself funded by payments from the Contractors under the terms of the CBA.  *Id*. ¶¶ 19-21.

### B.  The Massachusetts Paid Family and Medical Leave Act

The PFMLA requires most Massachusetts employers to allow their workers to take paid leave for certain purposes, such as managing a serious illness or bonding with a recently born child.  Mass. G.L. c. 175M, § 2.  It differs from the federal Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601-54, in several respects, including both the extent of coverage and, most notably, a mandate that the leave be in part *paid*.  Mass. G.L. c. 175M, § 3.  That partial income replacement is accomplished not by direct employer-employee payments, but instead by

a fund administered by the Massachusetts Department of Family and Medical Leave

("Department") that receives contributions from both employers and employees and then makes

payments to eligible employees.  *Id*. §§ 3-8.  During a given year, workers can take up to 20

weeks of "medical leave" for certain specified purposes, and generally up to 12 weeks of "family

leave" for certain others, but in no event more than 26 weeks for all such leave combined.  *Id*.

§§ 2(a)-(c).  The defendant Director oversees the Department.  *Id*. § 8.

The present case concerns not the PFMLA's income-replacement provisions but instead

another important requirement, codified in Section 2(f), that ensures that an employee need not

fear losing health insurance because of taking PFMLA leave.  As originally enacted in 2018, the

pertinent language in Section 2(f) read:

> During the duration of an employee's family or medical leave, the employer *shall provide*
> *for and contribute to* the employee's employment-related health insurance benefits, if
> any, at the level and under the conditions coverage would have been provided if the
> employee had continued working continuously for the duration of such leave.

Mass. G.L. c. 175M, § 2(f) (as enacted by Mass. St. 2018, c. 121, § 29) (emphasis added).

### C.    PCA's Efforts to Have PFMLA Section 2(f) Amended

Because the just-quoted sentence in the original Section 2(f) is phrased in the

conjunctive, it could reasonably be construed as requiring the employer of a worker on PFMLA

leave to continue making the same cash contributions toward health insurance that it would have

made had the employee continued working.  PCA and others claimed that that created an issue

for employers like the Contractors that provide health benefits via *multi-employer plans*, which

are governed not only by ERISA but also by the LMRA.  *See* PCA Answers to Interrogatories

("Int. Ans.") (attached as Exhibit 1 to Declaration of Douglas Martland ("Martland Decl.")) No.

11; Declaration of Michael Morris (a PCA lobbyist) ("Morris Decl.") ¶ 4.  The specific issue was

that (1) LMRA Sections 186(a) and (c)(5) prohibit employer payments to a multi-employer plan

without a written basis for the payment in a collective bargaining or similar agreement, (2) many

such agreements (including PCA's) provide for employer contributions only for hours *actually*

*worked* by an employee, Compl. ¶¶ 23-26, and (3) the sentence in the original Section 2(f)

quoted above, in contrast, required contributions when a worker was on leave and therefore *not*

working. *See* Int. Ans. No. 11; Martland Decl. Exh. 2, Attachment 1 (May 13, 2019 letter from

PCA and others to Chairs of relevant Massachusetts Legislature Joint Committee); Morris Decl.

¶ 4; Deposition of PCA's then-Executive Director Jeremy Ryan ("Ryan Dep.") 99, 128-30, 140.

PCA and other employer groups also claimed that that original sentence in Section 2(f) created

an ERISA issue as well.  Martland Decl. Exh. 2, Attachment 1; Morris Decl. ¶ 4.

This question of potential LMRA/ERISA conflicts prompted talks between employers

with multi-employer plans and labor groups for a proposed statutory "fix."  *See* Int. Ans. No. 3;

Morris Decl. ¶ 2.  These negotiations resulted in a jointly proposed statutory amendment, later

enacted, that the conjunctive "shall provide for and contribute to" be changed to the disjunctive

"provide for, contribute to or otherwise maintain."  Morris Decl. ¶ 4.  That would have the

sentence read as it does now, with no required employer-to-plan contributions:

> During the duration of an employee's family or medical leave, the employer shall provide
> for, contribute to or otherwise maintain the employee's employment-related health
> insurance benefits, if any, at the level and under the conditions coverage would have been
> provided if the employee had continued working continuously for the duration of such
> leave.

Mass. G.L. c. 175M, § 2(f) (as amended by Mass. St. 2020, c. 358, § 82).  As for what would

replace the cash contributions, "it was the [ ]PCA's understanding that the legislative amendment

would allow management and labor an opportunity to amend the terms of their . . . collectively

bargained health . . . plans so that they would be consistent with the" PFMLA.  Int. Ans. No. 3.

The requested statutory amendment was thus part of "a two-step compromise," *id*., whereby

(1) the new PFMLA language would allow employers to comply by collective bargaining agreement/plan amendments rather than by cash contributions, *see id*. No. 11, and (2) upon the statutory amendment taking effect, management and labor would then amend their plans and bargaining agreements consistent with the revised law. *Id*.; Morris Decl. ¶ 5; Ryan Dep. 26-27.

Once the labor and management groups arrived at this compromise, they jointly sent two letters, *which PCA's Executive Director signed*, explaining the compromise and urging, as the "first step," enactment of the proposed statutory amendment: one letter to members of the Massachusetts Senate and House of Representatives on August 11, 2020, and a second one to the Governor on January 12, 2021, when Section 2(f)'s amendment was before him for signature. Morris Decl. ¶ 6, Exhs. A-B; *see* Ryan Dep 24. The key language in both letters is identical:

> The solution is this: by adding the words "or otherwise maintain," to Section 2(f) of the PFMLA, the law will allow our multiemployer health plans, which are funded by contributions for each hour worked . . . , to maintain health insurance benefits if an employee goes out on leave.
>
> *The unions and the contractor associations are in agreement – they will amend their health plans' Summary Plan Descriptions, their collective bargaining agreements and their trust documents to guarantee that all union members' health insurance benefits are maintained* while the member is on leave. This 3-word fix to the state statute will allow union members to enjoy the benefits the PFML provides and will obviate the union employer's "Sophie's Choice" of whether to violate federal law or state law . . . .

Morris Decl. Exh. A p. 3, Exh. B p. 2 (emphasis added). PCA's Executive Director and the other employer signatories thus told the Legislature and the Governor that they had agreed with their unions to take a step that would resolve the identified problems with the LMRA and ERISA, and that all they needed was state-law authorization to allow that step to occur. *See id*.; Morris Decl.

¶¶ 5-6; Ryan Dep. 24; *see also* Int. Ans. No. 11 ("The legislative amendment made it possible for unionized employers to comply with state law . . . without violating the LMRA").[1]

That state-law authorization became reality when the Governor signed the Section 2(f) amendment into law on January 14, 2021.  *See* Mass. St. 2020, c. 358, § 82.  But no Plan or CBA amendments then followed, contrary to PCA's prior statements to the Legislature and the Governor.  *See* Int. Ans. Nos. 14-15.  PCA instead continued with the present lawsuit, which it had filed before Section 2(f)'s amendment, and it indeed amended its complaint to contest the statutory language that it had just proposed.  *See* Dckt. Nos. 1, 8.  PCA provides extended and convoluted interrogatory responses as to why it failed to complete the specific step that it had requested legislative authorization to take.  Int. Ans. Nos. 5, 16-17.  The essence of its interrogatory responses is that its Contractors were unwilling to spend any new money to help finance CBA and Plan amendments (even though it had included no such caveat in either of its letters advocating for Section 2(f)'s passage).  *See id.*; *see also* Ryan Dep. 32-34, 50-53, 58.[2]

### D.     The Impact (or Not) of Amended Section 2(f) on PCA's Contractors

Now that Section 2(f)'s amendment has removed the requirement that PCA's Contractors make cash contributions to the Plan to cover insurance during PFMLA leave, it is unclear how Section 2(f) adversely affects PCA at all, for two main reasons.  First, some of its Contractors are independently required to maintain the health benefits of their on-leave employees by the FMLA.

---

[1]     PCA joined in the 2021 letter despite a prior meeting with Local 12 that most decidedly did *no*t end in an agreement.  *See* Ryan Dep. 58, 61-63.  PCA's then-Executive Director now says both that PCA joined in part because an agreement "was still possible to happen," *id*. 143, but also that by "mistake" he did "not catch where it says 'we are in agreement.'"  *Id*. 106.

[2]     Apparently influencing the Contractors was an informal PCA-Local 12 cost estimate that was described by PCA's then-Executive Director as "back of the napkin," Ryan Dep. 34-35, 61-63, 69-71, 74-76, and that may have been based on a key false assumption.  *See id*. 69-71.

This is because the FMLA regime has its own benefits-maintenance requirement, 29 C.F.R. § 825.209(a), and its leave runs *concurrently* with PFMLA leave for employees who are eligible for both, *id*. § 825.701(a); *see* Mass. G.L. c. 175M, § 2(l).  Section 2(f) therefore has no effect on a Contractor whose worker on PFMLA leave also qualifies for FMLA leave, since the FMLA's own maintenance provision independently applies and accomplishes the exact same result.  *See also* Ryan Dep. 47-49 (some Contractors exceed FMLA's 50-employee threshold); Deposition of PCA Executive Director Andrew DeAngelo ("DeAngelo Dep.") 12 (same).

Second, while the FMLA does not reach employers with fewer than 50 employees, 29 U.S.C. § 2611(4)(A)(i), and while it and the PFMLA have some variations in coverage for those with 50 or more workers, PCA has yet to establish that in any instance where the FMLA has not concurrently applied, a PCA Contractor has had an employee actually lose health-insurance coverage as a result of taking PFMLA leave.  *See*, *e.g.*, PCA Responses to Defendant's First Requests for Admissions ("RFA Resp.") (Martland Decl. Exh. 2) No. 2.[3]  Indeed, neither PCA's current Executive Director, its former Executive Director, nor the Administrator of the Plan's Fund is aware of such an employee losing coverage because of the PFMLA.  DeAngelo Dep. 23, 28, 33; Ryan Dep. 67, Declaration of Roger Gill ("Gill Decl.") ¶ 6.  The lack of such proof is unsurprising, since the Plan recognizes the intermittent nature of plumbing work and, as explained by PCA itself, arranges for benefits coverage during slack periods:

> The Plan provides an arrangement whereby employees may maintain their health insurance coverage when they are not working.  The Plan provides health insurance coverage to an eligible employee for a six-month period, provided that the employee

---

[3]    PCA is explicit that "as of the date of this response, . . . [ ]PCA admits that it has not identified an employee of [ ]PCA's Signatory Contractors who has taken PFMLA [*sic*] and had his or her employment related health insurance benefits terminated while out on that leave."  *Id*. PCA prefaces that admission with an "object[ion] on the ground that it has no way of actively tracking PFML leave taken by the employees of each of its approximately sixty Signatory Contractors," *id*., thereby implicitly underscoring its current lack of actual proof.

worked the requisite number of hours . . . during the preceding six-month period.
Specifically, the Plan provides that an employee will be eligible for health insurance
coverage through each six-month coverage period, if the employee's credited hours for
the preceding six-month eligibility period (period when actual hours were worked) total
600 or more.  Under the Plan, if an employee works more than 600 hours during an
eligibility period, the employee may bank the surplus hours in an Hours Bank and use
the banked hours during future eligibility periods as necessary to maintain eligibility for
health insurance coverage, such as when the employee is . . . on a leave of absence.

Int. Ans. No. 12; *accord* Gill Decl. ¶¶ 7-8.  Under this benefits eligibility structure, an employee

taking PFMLA leave would retain health coverage throughout the six-month Plan "coverage

period" that he or she was then in, as long as he or she had worked 600 hours during the

immediately preceding "eligibility period."  Gill Decl. ¶ 7.  And while that on-leave employee

would not be continuing to work for purposes of accruing 600 hours for his or her *next* six-month

Plan "coverage period," the employee would be able to tap into all accumulated surplus hours in

his or her "hours bank" to provide a backup source of coverage for that next coverage period.  *Id.*

¶ 8.  Only an employee who had not accumulated sufficient hours in the hours bank might be at

risk of losing benefits during the next coverage period.  PCA states that that "could" happen, *id.*,

but it again has yet to provide any evidence that it ever actually has, and in late 2020 even its

own Executive Director thought of the likelihood as "very rare."  Ryan Dep. 113-17, Exh. 10.

PCA instead stresses that an on-leave employee will in fact often use his or her hours

bank to maintain coverage during the next coverage period, and it argues that that "draw down"

of the hours bank is itself a Section 2(f) violation.  *See*, *e.g.*, Joint Status Report and Scheduling

Proposal (Dckt. No. 37) pp. 3-4; RFA Resp. Nos. 2, 7, 15.  But the Director, who administers the

PFMLA as head of the Department, *see* Mass. G.L. c. 175M, § 8, holds the opposite

interpretation of Section 2(f), *see* Declaration of Undersecretary of Labor and Workforce

Development Michael Doheny ("Doheny Decl.") ¶ 4, and his interpretation of a state law that he

implements is entitled to deference.  *See*, *e.g.*, *Pharm. Research v. Concannon*, 249 F.3d 66, 75

(1st Cir. 2001), *aff'd*, 538 U.S. 644 (2003).  The Department has indeed recently published a proposed update to its PFMLA regulation that would codify the Director's interpretation of Section 2(f) (which is also the Department's longstanding one) as permitting the use of banked hours.  Declaration of William Alpine ("Alpine Decl.") ¶¶ 8-9, Exh. A (proposed 458 Code Mass. Reg. § 2.16(1)(c)); *see also id*. Exh. B; Doheny Decl. ¶ 4.[4]  That proposed regulation is now proceeding through the Commonwealth's regulatory approval process.  Alpine Decl. ¶ 9.

### E.     PCA's Present Lawsuit and Its Preemption Claims

While PCA filed this suit before Section 2(f)'s amendment, *see* Dckt. No. 1 (challenging original statute), it later filed amended pleadings to challenge its own requested language change, *id*. Nos. 4, 8.  To invalidate the amended law, PCA's currently operative pleading makes five preemption claims:  three under ERISA, Compl. ¶¶ 45-57; one based on an asserted continued conflict with Section 186 of the LMRA, *id*. ¶¶ 59-68;[5]  and one under the LMRA's so-called "*Machinists*" preemption doctrine, *id*. ¶¶ 69-72.  For the following reasons, the Court lacks subject-matter jurisdiction over all of them.

## II.    ISSUES OF ARTICLE III SUBJECT-MATTER JURISDICTION ARE APPROPRIATELY RAISED BY A POST-ANSWER MOTION TO DISMISS SUPPORTED BY DECLARATIONS.

"The objection that a federal court lacks subject-matter jurisdiction, *see* Fed. Rule Civ. Proc. 12(b)(1), may be raised by a party . . . at any stage in the litigation."  *Arbaugh v. Y&H Corp*., 546 U.S. 500, 506 (2006); *see also* Fed. R. Civ. P. 12(h)(3) ("If the court determines at

---

[4]     "Hours banks" were in fact a way that employers had said they intended to "otherwise maintain" benefits once Section 2(f) was amended.  Doheny Decl. ¶ 3; *see* Ryan Dep. 83.

[5]     The continued LMRA Section 186 claim is a curious one, since PFMLA Section 2(f)'s change to a disjunctive phrasing removed the employer-contribution requirement that had been the source of the prior LMRA Section 186 issue.  *See* Section I.C above.

any time that it lacks subject-matter jurisdiction, the court must dismiss the action").  As a result,

even though a motion to dismiss generally must be filed before the answer, Fed. R. Civ. P. 12(b)

¶ 2, one for lack of subject-matter jurisdiction may be filed at any time under Rule 12, via at least

two different means.  Some courts allow such a post-answer motion to dismiss under Rule

12(b)(1),[6] while others entertain the motion directly under Rule 12(h)(3).[7]  The First Circuit

itself has affirmed the allowance of a subject-matter-jurisdiction motion to dismiss that was

made late in the case and that invoked both Rules.  *Templeton Bd. of Sewer v. Amer. Tissue

Mills*, 352 F.3d 33, 36 (1st Cir. 2003) (motion to dismiss filed after denial of summary-judgment

motion).[8]  The present Motion accordingly relies on both Rule 12(b)(1) and Rule 12(h)(3).

---

[6]      *See, e.g.*, *Jackson v. U.S.*, 110 F.3d 1484, 1486 (9th Cir. 1997) ("A motion to dismiss
pursuant to the *Feres* doctrine, even if raised after the answer to the complaint, should be treated
as a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) rather
than as a motion for summary judgment"); *Spade v. U.S.*, 531 F.Supp.3d 901, 903 (M.D. Pa.
2021) ("An evaluation under 12(b)(1) 'may occur at any stage of the proceedings'") (quoting
*Mortensen v. First Fed. Savings & Loan Ass'n*, 549 F.2d 884, 891 (3rd Cir. 1977)).

[7]      *See, e.g.*, *Berkshire Fashions, Inc. v. M.V. Hakusan II*, 954 F.2d 874, 879 n.3 (3rd Cir.
1992) ("The distinction between a Rule 12(h)(3) motion and a Rule 12(b)(1) motion is simply
that the former may be asserted at any time"); *Finnegan v. Long Island Pwr. Auth.*, 409
F.Supp.3d 91, 95 (E.D.N.Y. 2019); *Jo v. JPMC Specialty Mortgage, LLC*, 248 F.Supp.3d 417,
421-22 (W.D.N.Y. 2017).  *See generally Glancy v. Taubman Ctrs., Inc.*, 373 F.3d 656, 662 (6th
Cir. 2004) ("Rule 12(h) permits a defense based on lack of subject matter jurisdiction to be
raised in a motion other than a Rule 12(b)(1) motion").  The Ninth Circuit at times uses the
phrasing of a Rule 12(h)(3) post-answer "suggestion," rather than "motion," but the result is the
same.  *See, e.g.*, *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 955 n.2 (9th Cir. 2004).

[8]      *Accord Marco S. Marinello Assoc., Inc.* v. *C.L.R.*, 525 F.2d 147, 151 (1st Cir. 1976)
("Rule 12(h)(3) motion to dismiss" challenging diversity jurisdiction permissible even after
defendant previously had "admit[ted] diversity jurisdiction in its answer"); *Anvar v. Tanner*, 549
F.Supp.3d 235, 239 (D.R.I. 2021) (post-answer and fact-based Rule 12(b)(1) motion challenging
plaintiff's standing "consider[ed] . . . under Rule 12(h)(3)").  Although "[g]enerally, '[t]he proper
vehicle for challenging a court's subject-matter jurisdiction is . . . Rule . . . 12(b)(1),'" *Anvar*,
549 F.Supp.3d at 239 (quoting *Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 362 (1st Cir. 2001)),
a post-answer Rule 12(h)(3) motion is fully permissible in the First Circuit, as the just-cited
authorities make clear.  *See also Audette v. Carrillo*, 2017 WL 1025688, at *2 (D. Mass. 2017)
(after partial denial of Rule 12(b)(6) motion to dismiss, second motion to dismiss challenging
subject-matter jurisdiction considered under Rules 12(b)(1) and 12(h)(3)).

Whichever vehicle is used, "the difference between a Rule 12(b)(1) motion and a Rule 12(h)(3) motion is largely academic, and the same standards are applicable to both types of motions." *Finnegan v. Long Island Pwr. Auth.*, 409 F.Supp.3d 91, 95 (E.D.N.Y. 2019); *accord Cruz v. AAA Carting and Rubbish Removal, Inc.*, 116 F.Supp.3d 232, 239 (S.D.N.Y. 2015). Those standards are that "the court enjoys broad authority to . . . consider extrinsic evidence," *Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 363 (1st Cir. 2001); *accord Anvar v. Tanner*, 549 F.Supp.3d 235, 239 (D.R.I. 2021), that "the plaintiff's jurisdictional averments are entitled to no presumptive weight," *Valentin*, 254 F.3d at 363, and that instead "[t]he plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence," *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2nd Cir. 2005); *accord Valentin*, 254 F.3d at 366. The First Circuit is also clear that "a district court cannot convert a factual challenge under Rule 12(b)(1) into a summary judgment motion." *Valentin*, 254 F.3d at 364. [9]

## III.    PERTINENT ARTICLE III STANDING AND RIPENESS STANDARDS

An association such as PCA "has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v.*

---

[9]    Such a fact-based jurisdictional motion instead should be resolved directly, *id.* at 365, although an evidentiary hearing is not necessarily required, *id.* at 364. Different standards apply where, unlike here, a defendant simply challenges the facial sufficiency of a complaint's jurisdictional assertions. *Id.* at 363. The First Circuit has also stated that a court "may defer resolution of jurisdictional issue until the time of trial" in the event that "the jurisdictional facts . . . are inextricably intertwined with the merits of the case." *Id.* at 363 n.3; *but see Perez-Kudzma v. U.S.*, 940 F.3d 142, 144 (1st Cir. 2019) ("we are obliged to assure ourselves of our jurisdiction under the federal constitution before we may proceed to the merits") (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)). This case lacks any such "inextricabl[e] intertwine[ment]" – the Court need not delve into the intricacies of ERISA preemption, for example, to determine that PCA's asserted harm is self-inflicted. *See* Section V below.

*Laidlaw Envt'l Svc., Inc.*, 528 U.S. 167, 181 (2000).  PCA has pled that it meets all three elements, Compl. ¶¶ 1-2, 8, and the Director is not, as of now, contesting the second or third ones.  The Director does vigorously dispute whether PCA's "members would otherwise have standing to sue in their own right."  *Laidlaw*, 528 U.S. at 181.  Because PCA is attempting to sue in a solely representative capacity, and for the sake of efficiency, all references to PCA in Sections IV and V below should be read to encompass its member Contractors as well.

"Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies,'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) ("*SBA List*") (quoting U.S. Const., Art. III, § 2), and "[t]he doctrines of standing and ripeness 'originate' from th[at] same Article III limitation."  *Id.* at 157 n.5 (quoting *DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 335 (2006)).  "To establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'"  *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)).  The "concrete, particularized, and actual or imminent" part of this tripartite constitutional standing test constitutes its "injury-in-fact requirement," *N.H. Lottery Comm'n v. Rosen*, 986 F.3d 38, 50 (1st Cir. 2021), while the "fairly traceable to the challenged action" portion is its "traceability requirement," *Calif. v. Tex.*, 141 S.Ct. 2104, 2114 (2021).  The present case implicates both.[10]

As for the "injury in fact" requirement, two principles have developed under it that apply directly here.  First, and as elaborated on in Section V below, "self-inflicted injuries are not even

---

[10]     The Article III standard's third requirement of "redressability" is not at issue here.  While the Supreme Court traditionally recognized certain additional non-constitutional or "prudential" standing requirements, it has "moved away from considering prudential standing separate[ly]," *Aguasvivas v. Pompeo*, 984 F.3d 1047, 1053 (1st Cir. 2021), and the Director bases the present Motion's standing arguments solely on Article III.

injuries in fact." *Buchholz v. Meyer Njus Tanick, P.A.*, 946 F.3d 855, 866 (6th Cir. 2020); *accord Nat'l Fam. Planning v. Gonzalez*, 468 F.3d 826, 831 (D.C. Cir. 2006). They also "fail[ ] the second standing prerequisite, traceability," since "[a] self-inflicted injury, by definition, is not traceable to anyone but the plaintiff." *Buchholz*, 946 F.3d at 866; *accord Clapper*, 568 U.S. at 416; *Gonzalez*, 468 F.3d at 831. The other "injury in fact" principle relevant here concerns its "actual or imminent" element. The Supreme Court has elaborated on that element's contours:

> "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." . . . Thus, we have repeatedly reiterated that "threatened injury must be *certainly impending* to constitute injury in fact," and that "[a]llegations of *possible* future injury" are not sufficient. *Whitmore*[ *v. Arkansas*], 495 U.S.[ 149,] 158 [(1990)].

*Clapper*, 568 U.S. at 409 (emphasis in original); *see also id*. at 410 (rejecting an "objectively reasonable likelihood" standard). The Court has therefore made clear that a "theory of standing [that] relies on a highly attenuated chain of possibilities . . . does not satisfy the requirement that threatened injury must be certainly impending." *Id*. at 410. While the First Circuit views the Supreme Court as recently adjusting the articulated formulation of the "imminence" requirement to permit standing where future harm is "certainly impending" *or* there is a "substantial risk that the harm will occur," *Rosen*, 986 F.3d at 50 (quoting *SBA List*, 573 U.S. at 158), neither court has indicated that the standard's strictness has diminished in actual application.[11] And it remains very much the case that "[t]he party invoking federal jurisdiction bears the burden of establishing' standing," *SBA List*, 573 U.S. at 158 (quoting *Clapper*, 568 U.S. at 411-12), with

---

[11]     *See Reddy v. Foster*, 845 F.3d 493, 501-02 (1st Cir. 2017) ("substantial risk" not shown where there was a "contingent future event that[ ] may not occur as anticipated, or indeed may not occur as all"); *see also Whole Women's Health v. Jackson*, 141 S. Ct. 2494, 2495 (2021) (straight "certainly impending" formulation used in denying interlocutory injunctive relief); *Buchholz*, 946 F.3d at 865 ("it is not enough that the future injury is reasonably likely to occur").

"[e]ach element . . . supported in the same way as any other matter on which the plaintiff bears the burden of proof."  *Id*. (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

Similarly, "[t]he burden to prove ripeness is [also] on the party seeking jurisdiction." *Labor Relations Div. v. Healey*, 844 F.3d 318, 326 (1st Cir. 2016).  That separate Article III requirement has its own traditional formulation, which the First Circuit has summarized:

> In determining whether an issue is ripe for our review, we consider "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration."  The fitness prong of this inquiry implicates both constitutional and prudential justiciability concerns. Article III principles require us first to ask "whether the claim involves uncertain and contingent events that may not occur as anticipated or may not occur at all," thus rendering any opinion we might offer advisory.  The prudential component of the fitness test asks whether resolution of the case turns on "legal issues not likely to be significantly affected by further factual development."  On the other hand, the hardship prong of this inquiry is purely prudential and requires that we evaluate "whether the challenged action creates a 'direct and immediate' dilemma for the parties."

*Algonquin Gas Transmission, LLC v. Weymouth*, 919 F.3d 54, 62 (1st Cir. 2019) (citations omitted).  This Motion is based on the constitutional portion of the fitness prong.[12]  That Article III inquiry into "whether the claim involves uncertain and contingent events that may not occur as anticipated or may not occur at all," *id*., aims to prevent "hypothetical rulings about hypothetical facts."  *Overdrive Inc. v. Open E-Book Forum*, 986 F.3d 954, 958 (6th Cir. 2021).  It also overlaps with the "injury in fact" standing requirement's "actual or imminent" element, *see Reddy v. Foster*, 845 F.3d 493, 502 (1st Cir. 2017) (using "contingent future events" formulation in standing inquiry), and the Director argues both together in Section IV below.

---

[12]     Given recent decisional developments at the Supreme Court level, the First Circuit noted last year that "it is unclear whether prudential ripeness concerns . . . may still be considered."  *Aguasvivas v. Pompeo*, 984 F.3d 1047, 1053 (1st Cir. 2021) (citing *SBA List*, 573 U.S. at 167).

**IV.   PCA HAS FAILED TO SHOW EITHER THAT ANY OF ITS CONTRACTORS HAVE ACTUALLY VIOLATED SECTION 2(f) OR THAT SUCH A VIOLATION IS IMMINENT, WHICH BOTH PRECLUDES THE "INJURY IN FACT" NECESSARY FOR ARTICLE III STANDING AND RENDERS THE ASSERTED PREEMPTION CLAIMS UNRIPE.**

As developed in Section I.D above, PCA has not been, and may never be, affected by Section 2(f).  That is a fatal to its case, since the First Circuit, cognizant of Article III, "ha[s] emphasized that 'a claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.'"  *Healey*, 844 F.3d at 326 (quoting *Fall River v. F.E.R.C.*, 507 F.3d 1, 6 (1st Cir. 2007)).  The First Circuit is therefore quite reluctant to wade into controversies where what is being challenged has yet to happen.  *Reddy*, 845 F.3d at 502 ("No buffer zone currently exists, and none has ever existed in the years since the filing of this lawsuit"); *Healey*, 844 F.3d at 327 ("employers acknowledge that they seek relief from . . . [legal] actions [under the state law being challenged] that have not yet been brought").  And as multiple Circuits have made clear, the possibility of an event occurring at some point in the future will not fill the gap when it is conditioned on a contingency that itself may well not come to pass.  *Overdrive, Inc.*, 986 F.3d at 958 (event "that may or may not happen" risks "hypothetical ruling[ ] about hypothetical facts"); *Reddy*, 845 F.3d at 502 (plaintiffs' "alleged injuries are all conditioned on the demarcation of a [buffer] zone," which "is a 'contingent future event'"); *Fall River*, 507 F.3d at 7 (suit against FERC not ripe where the "proposed LNG project may well never go forward because FERC's approval is expressly conditioned on approval by the USCG and DOI," and "[n]either has yet given its final recommendation").

These concerns are only heightened, and ripeness even harder to establish, when *multiple* contingencies must *all* occur before a plaintiff's feared outcome will become reality.  *Orix Credit Alliance, Inc. v. Wolfe*, 212 F.3d 891, 897 (5th Cir. 2000) ("several contingencies"); *Ernst &*

*Young v. Depositors Economic Protection Corp.*, 45 F.3d 530, 538 (1st Cir. 1995) ("long string

of contingencies" creating "lengthy chain of speculation").  In short, as the Sixth Circuit has

stressed, "*[i]f* and *when* do not a ripe controversy make.*"  Overdrive*, 986 F.3d at 958 (emphasis

in original).  In addition, and as set forth in Section III above, the existence of multiple uncertain

contingencies is equally fatal to the "imminence" element of the standing doctrine's "injury in

fact" requirement.  *See*, *e.g.*, *Clapper*, 568 U.S. at 410; *see generally Trump v. New York*, 141 S.

Ct. 530, 536 (2020) ("the standing and ripeness inquiries both lead to the conclusion that judicial

resolution of this dispute is premature"); *Reddy*, 845 F.3d at 505 (same).

  Multiple uncertain contingencies are exactly what exist here.  There are in fact at least

four conditions that must all occur before a PCA Contractor could establish that one of its

employees lost health insurance as a result of taking PFMLA leave.  First, the employee must

actually take such leave, after having an application to do so approved by the Department as

meeting the law's requirements.  *See* Mass. G.L. c. 175M, §§5(a), 8(b).  Second, that PFMLA

leave must not run concurrently with any applicable FMLA leave, which again has its own

benefits-maintenance requirement.  29 C.F.R. § 825.209(a).  Third, the PFMLA leave must

prevent the employee from working the amount needed to maintain eligibility in the next

coverage period (here, 600 hours in one six-month period to qualify for insurance in the next six-

month period).  S*ee* Int. Ans. No. 12; Gill Decl. ¶ 7.[13]  Fourth, the employee also must have

exhausted all hours in his or her "hours bank" that could be drawn upon as a backup to maintain

insurance during that next "coverage period."  *See* Int. Ans. No. 12; Gill Decl. ¶ 8.  The

---

[13] The next coverage period is focused on here because under the Plan, any insurance in the
*current* coverage period would continue through the end of that period.  *See id*.  And if under the
Plan the employee *already* lacked current-period insurance (*i.e.*, even while working), there
would be no insurance for the employer to "otherwise maintain."  Mass. G.L. c. 175M, § 2(f).

likelihood of the last two conditions occurring is in turn much reduced by the fact that PFMLA family leave is capped at 12 weeks and medical leave at 20.  Mass. G.L. c. 175M, § 2(c)(1).[14] These four contingencies are precisely the "lengthy chain of speculation" that precludes ripeness, *Ernst & Young*, 45 F.3d at 538, just as they are the "highly attenuated chain of possibilities" that defeats standing on "imminence" grounds, *Clapper*, 568 U.S. at 410.

PCA asserts that there "could" be an employee who ends up losing health insurance after meeting all four conditions, including depleting his or her hours bank.  Int Ans. No. 12.  But PCA bears the burden of proof on both standing and ripeness, *SBA List*, 573 U.S. at 158 (standing); *Healey*, 844 F.3d at 326 (ripeness), and it must satisfy that burden "in the same way as any other matter on which the plaintiff bears the burden of proof."  *SBA List*, 573 U.S. at 158. That means actual evidence, and to date PCA has produced none, both in response to written discovery, *see* Int. Ans. No. 12; RFA Resp. No. 2, and during the Fed. R. Civ. P. 30(b)(6) deposition of its designee on this topic.  *See* DeAngelo Dep. 17, 23, 28.[15]  Instead, PCA has offered only speculation about what "could" happen.  Int. Ans. No. 12.  This is the epitome of a claim based on "uncertain and contingent events that may not occur as anticipated or may not occur at all," *Algonquin Gas*, 919 F.3d at 62, which support neither ripeness nor standing.[16]  For this reason alone, the Court should dismiss this suit on both of theses Article III grounds.

---

[14]    It is only when the worker takes both family *and* medical leave in the same year that the ultimate statutory cap of 26 weeks comes into play.  *Id*.  Unsurprisingly given these statutory constraints, the average PFMLA leave period in FY 2021 was about 12 weeks.  Alpine Decl. ¶ 9.

[15]    PCA's assertion in its RFA objections that "it has no way of actively tracking PFML leave," *see*, *e.g*., RFA Resp No. 2, is a curious one, since PCA's members are notified each time one of their employees applies for leave.  Alpine Decl. ¶¶ 4-5.
.
[16]     To the extent PCA tries to change the subject from the absence of anyone in fact losing health insurance to the inevitability of some workers' hours banks being drawn down, an employer does not actually violate Section 2(f) by having an employee draw down an hours bank

**V.    PCA ADDITONALLY LACKS STANDING BECAUSE ANY SUPPOSED HARM IS ENTIRELY SELF-INFLICTED, WHICH FAILS TO SATISFY BOTH ARTICLE III'S "INJURY IN FACT" AND ITS "TRACEABILITY" STANDING REQUIREMENTS.**

An entirely separate barrier to Article III standing also exists.  As set forth in Section I.C above, PCA twice joined in letters, first to the Massachusetts Legislature and then to the Commonwealth's Governor, urging that Section 2(f) be changed to the very form that it challenges now.  Morris Decl. ¶ 6, Exhs. A-B.  As PCA stated at the time, it did so because the requested change would create state-law authority for amending the CBA and the Plan in a manner that would remove asserted federal-law issues – amendments that, it said, it already had an agreement with Local 12 to make.  *Id*.  But once Section 2(f) was changed as requested, PCA never saw that the amendments went through, apparently because it did not want to incur any additional expenses in connection with them.  *See* Int. Ans. Nos. 5, 16-17.  PCA thus failed to take the specific step that it had said it would take to resolve its dilemma, if only the Massachusetts Legislature would clear the way for that step as a matter of state law.

This constitutes self-inflicted harm, which as discussed in Section III above precludes standing, both because it is not "injury in fact," *Buchholz*, 946 F.3d at 866, and because it cannot be said to be "fairly traceable" to the defendant's conduct, *Gonzalez*, 468 F.3d at 831.  Importantly, Circuit decisions make clear that self-inflicted harm encompasses not only a plaintiff's self-injurious affirmative *action*, but also a plaintiff's *failure to undertake* an action that would have removed the asserted harm.  For example, in *Gonzalez*, the plaintiffs contended

---

to continue insurance coverage.  *See* Section I.D above.  That is the interpretation of the Director – the state official administering the PFMLA – and that is what is set forth in a proposed Department regulation reflecting that interpretation.  Alpine Decl. ¶ 9, Exh. A (proposed 458 Code Mass. Reg. § 2.16(1)(c)); Doheny Decl. ¶ 9.  It is common sense that PCA cannot be injured by a state-law prohibition that does not in fact exist.  *See Clapper*, 568 U.S. at 409 (to satisfy "injury in fact" requirement, an injury must also be "concrete" and "particularized").

that a supposed conflict between the requirements of a federal statute and regulation left them in

a "Catch 22" dilemma over how to comply with both, even though there was an available means

of resolving that dilemma – seeking clarification and guidance from the relevant federal agency –

that they had failed to avail themselves of.  468 F.3d at 829.  The D.C. Circuit rejected standing,

placing significant emphasis on the self-inflicted nature of the plaintiffs' alleged injuries:

> The supposed dilemma is particularly chimerical here because the association's asserted injury appears to be largely of its own making.  We have consistently held that self-inflicted harm doesn't satisfy the basic requirements for standing.  Such harm does not amount to an "injury" cognizable under Article III. . . . Furthermore, even if self-inflicted harm qualified as an injury it would not be fairly traceable to the defendant's challenged conduct. . . . Here the association has within its grasp an easy means for alleviating the alleged uncertainty.  It could inquire of HHS exactly how the agency proposes to resolve any of the conflicts that it claims to spot between the [statutory] amendment and the regulations. . . . It has never done so. . . . As the association has *chosen* to remain in the lurch, it cannot demonstrate an injury sufficient to confer standing.

*Id*. at 831 (emphasis in original).  The Sixth Circuit reached the same conclusion regarding

"traceability" in two recent decisions involving debtors who had failed to pay their debts and

then assertedly experienced anxiety when debt-collection law firms sent them letters.  *Garland v.

Orlans, PC*, 999 F.3d 432, 440-41 (6th Cir. 2021); *Buchholz*, 946 F.3d at 866.  As *Garland* makes

clear, both cases held that the debtors' voluntary choices not to pay their debts made any injuries

self-inflicted and thereby precluded standing on "traceability" grounds:

> Garland's anxiety allegation also fails standing's traceability requirement. . . . Self-inflicted injuries fail under this prong because they are, "by definition, ... not traceable to anyone but the plaintiff."  *Buchholz*, 946 F.3d at 866.
>
> . . . In *Buchholz*, we held that Buchholz's allegations were self-inflicted and thus not traceable to the law firm's letter.  *Id.* at 866-67.  We explained that Buchholz did not dispute his debts or allege the letter contained inaccurate information.  . . . And we concluded that "[t]he cause of that anxiety falls squarely on Buchholz because *he* chose not to pay his debts—and now fears the consequences of his delinquency.  *Id.*  So . . . the anxiety that Buchholz allege[d] is not traceable to anyone but him."  *Id.*
>
> . . .

. . . Ultimately, Garland's anxiety, like Buchholz's, "is not traceable to anyone but him." *Id.*  And so he "cannot establish standing based on his allegations of anxiety." *Id.*

*Garland*, 999 F.3d at 440-41.[17]

Purposeful inaction can thus be just as fatal to standing as voluntary action, and PCA's failure to take the specific step that it itself had identified as resolving its purported dilemma is an additional reason why standing does not exist.  Here, as in *Gonzalez*, PCA's "asserted injury appears to be largely of its own making," and since it "has *chosen* to remain in the lurch, it cannot demonstrate an injury sufficient to confer standing."  468 F.3d at 831 (emphasis in original).  And here, as in *Garland* and *Buchholz*, PCA's alleged injury "is not traceable to anyone but" itself, again with the result that it "cannot establish standing."  *Garland*, 999 F.3d at 441 (quoting *Buchholz*, 946 F.3d at 867).  While PCA asserts that it would have had to incur additional expense to take the step it had identified, *see*, *e.g.*, Int. Ans. Nos. 5, 16-17, that is immaterial, since the foregone steps in both *Garland* and *Buchholz* also involved the expenditure of money (*i.e.*, payment of the outstanding debts).  *Id.*  The self-inflicted nature of PCA's alleged harm thus also deprives it of standing, for reasons of both no "injury in fact" and no traceability.

## CONCLUSION

For the foregoing reasons, the Director respectfully requests that the Court allow Defendant's Motion to Dismiss for Lack of Article III Subject-Matter Jurisdiction.

---

[17]     *See also McConnell v. Fed. Elec. Comm'n*, 540 U.S. 93, 228 (2003) (candidates foreswearing large campaign contributions who then asserted that a statute raising contribution limits impaired their ability to compete electorally (since others might take advantage of the higher limits) "cannot show that their alleged injury is 'fairly traceable' to" the law, since "[t]heir alleged inability to compete stems not from the operation of [the law], but from their own personal 'wish' not to solicit or accept large contributions, *i.e.*, their personal choice"), *overruled on other grounds by Citizens United v. Fed. Elec. Comm'n*, 558 U.S. 93 (2010).

By his attorneys,

MAURA HEALEY
ATTORNEY GENERAL

/s/ Pierce O. Cray
Douglas S. Martland, BBO # 662248
Julie E. Green, BBO # 645725
    *Assistant Attorneys General*
Pierce O. Cray, BBO # 104630
    *Senior Appellate Counsel*
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
617-936-2085/2062/2084
julie.green@mass.gov
douglas.martland@mass.gov
pierce.cray@mass.gov

Dated: June 29, 2022

## **CERTIFICATE OF SERVICE**

I, Douglas S. Martland, hereby certify that the foregoing document, which was filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 29, 2022.

/s/ Douglas S. Martland
Douglas S. Martland, BBO # 662248